G., C. & S. F. R'y Co. v. J. L. VAUGHN.

(No. 3392.)

APPEAL from Runnels County. Opinion by HURT, J.

J. W. TERRY, counsel for appellant.

WINGATE & GUION, counsel for appellee.

§ 182. *Common carrier; liability of for conduct of connecting line; if it contracts to deliver goods beyond its own line, cannot limit its common-law liability to injuries occurring on its own line; case stated.* This suit was in-

stituted in the county court to recover damages to a shipment of cattle from Talpa, Tex., to Chicago, Ill., and for the failure to deliver thirteen head of said cattle at Chicago, it being alleged that appellant had contracted to carry the same from Talpa to Chicago over its own and connecting lines. The appellant pleads general denial and special answer. The case was tried before the court without a jury, and resulted in a judgment for appellee for $260. The contract of shipment in evidence contained the following stipulation: "Now, in consideration that said party of the first part will transport for the party of the second part fourteen car-loads of cattle from Talpa to Ft. Worth station, delivering it at last-named station to its connecting lines for transportation to Chicago, at the rate of $102 per car-load from Talpa to Chicago, the same being the special rate," etc. "And it is further stipulated and agreed between the parties hereto that, in case the live-stock mentioned should be transported over the line or lines of any other railroad or steamboat company, said party of the first part shall be released from liability of every kind after said live-stock shall have left its road, and the party of the second part hereby so expressly stipulates and agrees; the understanding of both parties hereto being that the party of the first part shall not be held nor deemed liable for anything beyond the line of the Gulf, Colorado & Santa Fe Railroad Company, except to protect the through rate of freight named herein." The evidence shows that all of the damages complained of occurred on the line of the Missouri Pacific Railway Company between Ft. Worth and Denison, and after the cattle had been safely delivered at Ft. Worth by the appellant to the Missouri Pacific Railway Company, which was the connecting line of the route to Chicago.

Under an assignment of error properly presenting the question of liability of the appellant company under the contract and the facts, the counsel for the company sub-

mit the following propositions: (1) "Where a carrier enters into a written contract to carry a shipment to a certain station, being the end of its own line, and there to deliver it to a connecting line for transportation to the place of destination, the mere fact that in such contract the carrier guaranties that the through rate of freight will not exceed a certain amount does not constitute a contract for through transportation by the first carrier to the point of destination, so as to render such carrier liable for damages occurring beyond its own line." (2) "Where a carrier executes and delivers to a shipper a through contract or bill of lading for a shipment to a point beyond its own line, it may stipulate in such contract that its liability may terminate at the end of its own line." To these propositions the counsel for appellee, Vaughn, replies by asserting the following proposition: "When a carrier executes and delivers to a shipper a through contract or bill of lading for a shipment to a point beyond its own line of road, it cannot limit its own liability to the end of its own line. It will be held responsible for the negligence not only of itself and its servants, but of the connecting line."

These propositions are directly conflicting. Which is correct? Before discussing these propositions, we desire to call attention to the fact that this suit is against the initiative company. The appellant received the cattle from the appellee, and executed the bill of lading. This is not a case against a connecting company or the company, but the party with whom the contract was made. It is the well-settled law of England that, when the carrier accepts for carriage goods directed to a destination beyond its own route, it assumes by the very act of acceptance, in the absence of any express contract upon the subject, the obligation to transport them to the place to which they may be directed. This rule has been adhered to without question or dispute by the English courts, and no principle is better settled than that which

obliges the carrier, when he accepts goods for transportation to a destination to which he himself does not carry, or which is off of or beyond his route, to nevertheless take upon himself the responsibility for both the carriage and the safety of the goods to destination; and if they be lost upon the route, no matter by whom, he becomes liable to the owner for the loss, unless he has protected himself against such liability by contract. The common-law rule we have stated evidently gives the carrier the right to protect himself from liability for loss or injury by a contract to that effect, though the bill of lading be what is known as a "through bill."

Now, we propose to demonstrate — that is, we believe we can demonstrate — that the principles relied upon, or which underlie the rule which holds the carrier to transport the goods to the final destination, and which holds him responsible for the loss, though it may occur beyond his line, will absolutely prohibit any such limitation, though made by express contract. Upon what principles or grounds is he held to deliver the goods to the final destination and be bound for the loss or damage thereto under a through bill of lading? Because he has so contracted, and his contract is that of a common carrier, not that of a private carrier. Now, then, having contracted to deliver the goods to the final destination, though beyond his line as a common carrier, can this common carrier limit his liability in any measure for any loss or injury to the goods? In the absence of such a limitation, would he not be held for the loss, though occurring beyond his line as a common carrier? Certainly he would. If the goods are to be delivered at a point on his line, no one will contend that the carrier could so limit his liability. Evidently, therefore, but one fact settles this question, and settles it absolutely. What is that fact? When a common carrier gives a through bill of lading by which the goods are to be delivered at a point beyond his line, the bill of lading is an express con-

tract to deliver them at that point. Now the question —
the fact — is, is this the contract of a common carrier?
If so, he cannot limit his liability. This conclusion fol-
lows inevitably. We have stated that this was the con-
tract of a common carrier. They are not the less so
because they had stipulated for a more restricted liability
than would have been theirs had their receipt contained
only a contract to carry and deliver. What they were is
to be determined by the nature of their business, not by
the contract they made respecting the liabilities which
should attend it. [Bank of Kentucky v. Adams Express
Co., 93 U. S. 180.] It is this principle upon which rests
the rule stated by Lawson on Carriers, § 235. He says:
"When he [the carrier] undertakes to convey goods not
only over his own line, but over connecting lines, he can-
not contract that his responsibility may terminate at the
end of his own line. He will still be held responsible for
the negligence not only of himself and servants, but of
the connecting line, they being considered his agents for
carrying out the particular contract."

In harmony with this author is the decision of the su-
preme court of the United States in the case of Bank of
Kentucky v. Adams Express Co., 93 U. S. 174. We can-
not express our views so well as they are stated in the
opinion of Mr. Justice Strong. He says: " On the 26th
day of July, 1869, the Southern Express Company re-
ceived from the Louisiana National Bank at New Orleans
two packages,— one, containing $13,528.15, for delivery
to the Bank of Kentucky, Louisville, and the other, con-
taining $3,000, for delivery to the Planters' National
Bank of Louisville, at Louisville. The money belonged
to the banks, respectively, to which the packages were
sent. When the packages were thus received, the agent
of the Southern Express Company gave a receipt or do-
mestic bill of lading for each, of which the following is
a copy (the two differing only in the description of the
consignees and in the amount of money mentioned):

Domestic bill of lading, Southern Express Company, express forwarders. 'No. 2. $13,528.15, July 26th, 1869. Received from Lou. Nat. Bank one package sealed, and said to contain thirteen thousand five hundred and twenty-eight and 15-100 dollars, addressed Bank of Kentucky, Louisville, Ky. Freight, coll. Upon the special acceptance and agreement that this company is to forward the same to its agent nearest or most convenient to destination only, and then to deliver the same to other parties to complete the transportation, such delivery to terminate all liability of this company for such package, and also that this company are not to be liable in any manner or to any extent for any loss, damage or detention of such package or its contents, or of any portion thereof, occasioned by the acts of God, or by any person or persons acting or claiming to act in any military or other capacity in hostility to the government of the United States. . . . The shipper and owner hereby severally agree that all the stipulations and conditions in this receipt shall extend to and inure to the benefit of each and every company or person to whom the Southern Express Company may intrust or deliver the above-described property for transportation, and shall define and limit the liability therefor of such other companies or person. In no event is this company to be liable for a greater sum than that above mentioned, nor shall it be liable for any such loss unless the claim therefor shall be made in writing at this office within thirty days from this date, in a statement to which this receipt shall be annexed. Freight, coll. For the Company, SHACKLEFORD.' Across the left-hand end of said receipt was the following printed matter: 'Insured by Southern Express Company for ——— to ——— only except against loss occasioned by the public enemy. For the Company. Insurance, $———.' The bills of lading were sent to the consignees at Louisville. Having thus received the packages, the Southern Express Company transported them by rail-

road as far as Humboldt, Tennessee, and there delivered them to the messenger of the defendants (who was also their messenger), to complete the transportation to Louisville, and to make delivery thereof to the plaintiffs. For that purpose the messenger took charge of them, placing them in an iron safe and depositing the safe in an apartment of a car set apart for the use of express companies for transportation to Louisville. Subsequently, while the train to which the car containing the packages was attached was passing over a trestle on the line of the Louisville & Nashville Railroad, and while the packages were in charge of the messenger, the trestle gave way during the night, the train with the express car was thrown from the track, and the car with others caught fire from the locomotive, and was burned, together with the money in the safe. The messenger was rendered insensible by the fall, and he continued so until after the destruction was complete. There was some evidence that some of the timber of the trestle seemed decayed.

"Upon this state of facts the learned judge of the circuit court instructed the jury that 'if they believed the package was destroyed by fire, as above indicated, without any fault or neglect whatever on behalf of the messenger or defendants, the defendants have brought themselves within the terms of the exceptions in the bill of lading, and are not liable.' And again, the court charged: 'It is not material to inquire whether the accident resulted from the want of care or from the negligence of the Louisville & Nashville R. R. Co., and its agents, or not.' And again: 'But when he (the common carrier) has limited his liability so as to make himself responsible for ordinary care only, and the shipper, to recover against him, is obliged to aver and prove negligence, it must be his negligence, or the negligence of his agents, and not the negligence of persons over whom he has no control. If, in his employment, he uses the vehicles of others, over which he has no control, and

uses reasonable care,— that is, such care as ordinarily prudent persons engaged in like business use in selecting the vehicles,— and if the loss arises from a cause against which he has stipulated with the shipper, he shall not be liable for the same, unless it arises from his want of care, or the want of care of his employees.' At the same time the learned judge instructed the jury as follows: ‘Without, therefore, deciding whether or not the evidence adduced in the case tends to establish any want of reasonable or ordinary care on the part of the Louisville & Nashville R. R., I instruct you that such evidence is irrelevant and incompetent, and that you should disregard it; that is, give no more effect to it than if it had not been adduced.' These extracts from the charge, to all of which exception was duly taken, exhibit the most important question in these cases, which is whether the stipulations of the carrier's receipt or bill of lading relieved them from responsibility for the negligence of the railroad company employed by them to complete the carriage. The circuit court was of opinion, as we have seen, that they did, and practically instructed the jury that under the modified contract of bailment the defendants were liable for loss by fire only to the extent to which mere bailees for hire, not common carriers, are liable; that is, that they were responsible only for the want of ordinary care exercised by themselves, or those who were under their control. With this we cannot concur, though we are not unmindful of the ability with which the learned judge has defended his opinion. We have already remarked the defendants were common carriers. . . . Having taken up the occupation, its fixed legal character could not be thrown off by any declaration or stipulation that they should not be considered such carriers.

"The duty of a common carrier is to transport and deliver safely. He is made by law an insurer against all failure to perform this duty, except such failure as

may be caused by the public enemy, or by what is denominated the 'act of God.' By special contract with his employers, he may, it is true, to some extent be excused if the limitations to his responsibility stipulated for are in the judgment of the law reasonable, and not inconsistent with sound public policy. It is agreed, however, that he cannot, by any contract with his customers, relieve himself from responsibility for his own negligence or that of his servants; and this, because such a contract is unreasonable, and contrary to legal policy. So much has been finally determined in Railroad Co. v. Lockwood, 17 Wall. 357." Allison's Case, 59 Tex. 193, is cited in support of the proposition that the carrier is responsible under a through bill of lading to deliver the goods to the final destination, though it may be beyond his line; and that he cannot, under such a contract, limit his liability to loss or damage occurring upon his own line by express contract to that effect. It is conceded by counsel for appellant that this case is not in point, because the company had agreed to forward the melons from Galveston to Chicago on the cars in which they were loaded, and that this was not done; they being taken from the cars in which they were placed at Galveston, and put into other cars. The change did not, however, occur on the G. H. R'y Co.'s line, but this occurred after the melons had left its line. Upon what ground did our supreme court hold the G. H. Co. responsible for this change of the melons? It had restricted its liability to loss or damage occurring on its own line. How was it responsible for that occurring on the line of another company? This responsibility upon the first company is based upon the fact that all connecting lines were the agents of the first company, and, this being so, the first company was responsible. Why were the connecting lines agents of the first line? For the reasons that it had agreed to transport the melons to Chicago, and as a common carrier,

and all connecting lines were its agents for the purpose of carrying out this particular contract; for the reasons given by Justice Strong, *supra*, which we think are conclusive. If the propositions stated from Lawson and the rule in the Bank Case were not applicable, why did our chief justice refer to them at all? He is not in the habit of referring to irrelevant matters in his opinions. But it is urged by counsel for appellant that the company can thus limit its liability for the reason that a common carrier is under no obligations to contract for the carriage of goods beyond its own line, and, when it assumes to impose an obligation on itself for the further transportation, this must be done by contract, express or implied, in which it may stipulate that its liability as a common carrier shall cease with the safe delivery to the next carrier of the things to be carried. The reason does not, in our humble judgment, warrant the conclusion. Concede that a common carrier is under no obligation to transport goods beyond his line, does it follow that he cannot make such a contract, and, if he makes such a contract, is it not the contract of a common carrier? Now, it is held by all the authorities and our supreme court that, if he makes such a contract with the limitation of responsibility omitted, he would be held responsible as a common carrier. Does the insertion of such a limitation change his character and make him a private carrier or forwarder of the goods? We think not. As our supreme court held a different doctrine, I have thought it due to our court to notice this subject at some length, as we have uniformly held that under a through bill of lading the carrier cannot limit his liability as was attempted to be done in this case. In this case we have discussed the liability of a carrier who makes the contract and gives a through bill of lading. Other cases are pending in which a connecting carrier or the last or destination carrier is the appellant. In these cases similar bills of lading appear,

and we will as soon as possible give our views upon the question thus presented; and we think some of the reasons given by our supreme court in a case in which a connecting line or the destination carrier is sought to be held responsible do not apply in this case.

But it is contended by counsel for appellant that in this case there is no through bill of lading from Talpa to Chicago. We think differently. The contract or bill of lading seems to us to have been prepared from the opinion in the supreme court. [Railroad Co. v. Pontius, 19 Ohio St. 221.] In that case the court held a bill of lading quite similar to this not to be a through bill. But the test is the intention of the parties, and not the form of expression used by the carrier. No one can read this bill and doubt that the shipper understood it to mean that his cattle were to be shipped from Talpa to Chicago. How? By being transported from Talpa to Ft. Worth, and there delivered to appellant's connecting lines to be transported on to Chicago. This is the plain meaning of the contract, and it evidences a through bill of lading. [Lawson, Carr., § 155.]

§ 183. *Notice to carrier of loss; pleading.* There is a condition precedent to recovery, that the shipper should give notice in writing of his claim for loss or injury to the officers or the nearest station agent of the company before the cattle were removed from the place of destination, and before they were mingled with other stock. A breach of this provision was pleaded by appellant. The court sustained special exceptions thereto, and this is assigned as error. This condition in the contract is in substance the same as that in the bill of lading in the case of Railway Co. v. Harris, 67 Tex. 166. The opinion in that case settles the question. The answer setting out this matter is not sufficient, and there was no error in sustaining the exceptions to the same.

June 25, 1890.                                    Affirmed.

ON REHEARING.

(Dec. 17, 1890.)

At the last Austin term the judgment in this case was affirmed, and the views of this court upon the questions presented by the appeal were expressed in a written opinion.   It was then held that, when a common carrier executes and delivers to a shipper a through contract or bill of lading for a shipment to a point beyond its own line of road, it (the carrier) cannot by a stipulation in such contract limit its liability to the end of its own line. It will be held responsible for the negligence not only of itself or its servants, but of the connecting line.   Upon this point the decision was restricted to cases involving the liability of the initiative carrier; that is to say, the one making the contract and giving a through bill of lading.   It was also held that the particular contract of shipment made in this case was a through bill of lading, within the meaning of the rule above, from Talpa, Tex., to Chicago, Ill.   It was further held that the pleading of the appellant company setting up a breach of a condition in the contract relating to written notice of claim for loss or injury was not sufficient to prevent a recovery in this case.   After the judgment was entered the case was transferred to this branch of the court, and appellant company was granted leave to file a motion for rehearing, and further leave was granted to file all amended motions for rehearing.   The motions were filed and submitted, and they have been considered.   We are content to let the decision stand as the judgment of this court, and we see no sufficient reason at this time to add to or take from the opinion delivered in disposing of the case in the first instance.   The decision is the law of this case, and it is the law of this court.   Our conclusions were not reached without mature consideration, diligent research, and serious reflection, such as seemed to us to

be demanded by the importance of the question involved. The motion for rehearing is overruled and refused.

There remains, however, for us to discharge a duty in connection with this motion, and it is a duty which ought never to be devolved upon a court of justice of any enlightened country. In connection with the motion there has been filed in this court among the papers of this case three copies of a document which purports to be, and is styled, "Appellant's Argument in Support of Motion for Rehearing." A great portion of the matter of this document is *dehors* the record, and could subserve no useful purpose. The manner in which the matter is presented is offensive and indecent. The spirit of it is malicious. Its character precludes its proper consideration by this court for any legitimate purpose in connection with the case. Much latitude is allowed to counsel. No greater privilege can be devolved upon any citizen than that which authorizes him to speak in behalf of the rights of his client, whether they be rights of life and liberty or right of property. But the line of demarkation which separates the right to speak in open court the truth as counsel sees it, and the unbridled license of the mob orator, is clear, distinct and known of all men. A sense of what is due to the court, of what is due to the profession of the law, and of what is due the people of this state, who created the court and who maintain it, should have restrained the writing of such a document, and might well invoke from this court an order more serious than that which will now be entered. The clerk of the court is ordered to strike from the files of this court, and from the record in this case, the papers herein referred to, and to return them to the writer thereof, J. W. Terry, Esq.

Motion overruled.